## DEFENSES OF ACCOMMODATION MAKER UNDER THE NEGOTIABLE INSTRUMENTS ACT.

Common Pleas Court of Muskingum County.

THE FRANKLIN BANK CO. OF NEWARK, OHIO, v. THE G. E. HOWELL PROVISION CO. ET AL.

Decided, June 4, 1915.

*Promissory Notes—Defense of the Privileges of a Surety Closed to an Accommodation Maker—Failure of the Bank (Holder) to Sue After Written Notice so to do—Verbal Release by Bank Officer Ultra Vires and of no Avail—Primary Liability of One Who Signs on the Face of a Note.*

1. One who signs a note as an apparent maker and principal debtor, can not subsequently assert the contrary and thus affect his liability on the instrument, and a defense based on the privileges of suretyship, as they existed prior to the negotiable instruments act, is open to demurrer.

2. A release in writing for a valuable consideration in and of itself constitutes a valid defense under the negotiable instruments act; but where the evidence supporting the allegation as to a release consists only of a verbal statement to the accommodation maker, by the cashier of the bank holding the note, that he was released—a statement a cashier would have no authority by virtue of his office to make, and which would be *ultra vires* in the mouth of any bank officer where no consideration had passed—no estoppel *in pais* is created, notwithstanding the accommodation maker acted upon it to his prejudice.

*Booth, Keating, Peters & Pomerene, Fitzgibbon & Montgomery* and *E. R. Meyer,* for plaintiff.
*E. F. O'Neal, B. F. McDonald* and *Roderick Jones,* contra.

FRAZIER, J.

A jury having been waived, this cause was submitted to the court upon the pleadings, the evidence, and the briefs of counsel. The plaintiff sues on a promissory note, a copy of which is as follows:

"$25,000.00.          NEWARK, OHIO, May 1, 1905.
"One day after date, for value received, we jointly and sever-
ally promise to· pay to the order of the Franklin Bank Co., at
Newark, Ohio, at its office, $25,000, with interest from maturity,
at 8% per year upon both principal and accrued interest, pay-
able annually, and we authorize any attorney at law in the
United States to appear before any court of record. after the
above money becomes due, and waive the issuance and service
of process, and to confess judgment against us or either of us,
in favor of the holder of this note, for the amount appearing due,
the costs of the suit, and an attorney fee; thereupon to release
all errors in any action brought or judgment rendered upon the
note.

"(Signed)    THE G. E. HOWELL PROV. CO.
                    JOHN M. FLEMING, Treas."
                    G. E. HOWELL, Pres.

"G. E. HOWELL,
"JOHN M. FLEMING."

John M. Fleming, one of the makers of said note, has filed an
answer to the petition, containing six separate defenses, but
two only of said defenses are now insisted upon, viz., the first
and the third.

In the first defense, it is averred that the defendant, Fleming,
signed the note set up in the petition, as surety for the G. E.
Howell Provision Co., the maker of the note, and that he re-
ceived no part of the consideration; that the plaintiff, at the time
of the execution and delivery of said note, had full knowledge
and notice of the fact that defendant Fleming was surety only
for the said the G. E. Howell Provision Co. and that he accepted
the said note with the full understanding and agreement with
the defendant Fleming that the defendant Fleming was surety
only on said note; that on the second day of August, 1909, after
said note became due and payable, defendant Fleming required
plaintiff, by notice in writing served upon it, to commence an
action forthwith against said principal debtor; that plaintiff
did not commence nor prosecute said action with due diligence
in that it did not, at the time nor at any time since, commence
nor prosecute said action, until the filing of the petition herein
on the nineteenth day of January, 1914.

It is averred in the third defense that on or about the second day of August, 1909, and for a long time thereafter, the G. E. Howell Provision Co. was a solvent institution and was enjoying credit, and able to obtain credit to a sufficient extent to cover all its needs, and did so obtain credit until the second day of August, 1909; that on said last date, the defendant Fleming was desirous of being relieved from his obligation on said note, and intended to take all such steps as were necessary to have said obligation extinguished or satisfied, all of which facts the plaintiff well knew; that at said last mentioned date, this defendant, Fleming, had full knowledge of the ability of the Howell Provision Co. to meet its obligations and to obtain credit to meet all its obligations, and this plaintiff, at said time, had knowledge of the ability of said Howell Provision Co. to meet its obligations and obtain credit, and at said time this defendant fully informed the plaintiff of his desire to be released from the obligation of the note and his intention to take such steps as were necessary to cover and satisfy his obligation on the same; that at said time or soon thereafter, the said plaintiff, for a valuable consideration, in writing released and discharged this defendant from all further liability upon said note in the petition described, and thereupon said plaintiff represented to this defendant and caused him to believe that the said plaintiff had fully, effectually, and legally released him from all obligations upon said note; that because of such representation by the plaintiff and defendant's belief in the same and reliance thereon, plaintiff prevented defendant from taking such steps at that time as he would otherwise have taken to have released himself of all obligation under said note and from obtaining complete extinguishment and satisfaction of his obligation on the same; that ever since said date plaintiff has represented to this defendant and caused him to believe that he had no obligation arising upon said note, and because of such representations this defendant did believe that he had no obligation on the same, and because of such representations and such belief defendant was thereby prevented from taking the steps he otherwise would have taken to enforce the collection of said note against the defendant company at a time when collection could have been

made without loss to this defendant. Because of the representations, this defendant did forbear to take any steps to enforce collection of said note against the G. E. Howell Provision Co. and did forbear doing anything to protect himself from loss on account of said note. That the said Provision Company is now insolvent and its affairs are being administered by a receiver and its estate will pay to the creditors a dividend of only about fifty per cent. That on said second day of August, 1909, and for at least one year thereafter, said G. E. Howell was the owner in fee simple of large amounts of real estate situated in Licking county and elsewhere, free and clear of all encumbrance, and that by reason of said representations made by said plaintiff bank, said Fleming was caused to believe and did believe that said plaintiff had fully released him from all obligation on said note, and that because of such representations and defendant's belief in the same and reliance upon the same, the plaintiff prevented the defendant from taking such steps as he otherwise would have taken to obtain contribution from said George E. Howell for any money which this defendant might have paid or be compelled to pay by reason of his liability on said note. That ever since the said date of August 2d, 1909, down to and including the date of the filing of this suit, the defendant, because of said representations, did believe that he had no obligation on said note, and because of such belief the defendant, Fleming, did forbear to take any steps to enforce contribution from the said G. E. Howell for any money which the defendant may have paid or be compelled to pay by reason of his liability on said note. That at various times since the second day of August, 1909, and prior to the filing of this suit, the said George E. Howell, by various conveyances and mortgages, has sold or encumbered for its full value, all of the real estate belonging to said Howell in Licking county or elsewhere. That the said Howell is now insolvent, that he has no property of any description, known to this defendant, from which by execution or otherwise a sufficient amount could be made to contribute to this defendant his share of any money that this defendant may pay or be compelled to pay by reason of his liability on said note. And said defendant, Fleming, says that by reason of the prem-

ises, especially by reason of the representations in his defense alleged to have been made by the plaintiff to this defendant, and by reason of the valuable rights which this defendant has lost by reason of said representations and his reliance thereon, the plaintiff was and is estoppped from enforcing any liability of this defendant to it by reason of said note.

To this answer the plaintiff has filed a reply denying all the allegations therein contained.

The plaintiff, at the trial, objected to the reception of any testimony in support of said defenses, on the ground that the facts therein do not constitute a defense. The first question, therefore, to be decided is, whether the facts alleged in either of said defenses constitute a valid defense to the note.

It is plaintiff's claim that, under the principles stated in the case of *Richards* v. *Bank*, 81 O. S., 348, *et seq.*, both of said defenses are amenable to a demurrer. On the other hand, the defendant claims that the Richards case should not govern here for the reasons, (1) that the above named defenses present a state of facts not involved in the decision of that case, and hence that the principles announced therein do not govern here; (2) that the court, in the Richards case, through misapprehension and misconception of the scope of the negotiable instruments act, has broadly construed the provisions of said act relating to the discharge of instruments and the release of parties (which provisions defendant claims are designed to affect rights of holders in due course) to apply indiscriminately to all holders of negotiable instruments; in other words, defendant's counsel claim that the provisions of the negotiable instruments act relating to the discharge of instruments and the release of parties are without force and effect, until there has been a negotiation of the instrument; and that the provisions regarding discharge and release relate to the status of the parties and the condition of things upon and after the act of negotiation of the instrument and not to the status or the liability of the parties before negotiation; (3) that as between the original parties to a negotiable instrument, and as between all holders (otherwise than as holders in due course) and the other parties to the instrument, every defense available prior to the time the negotiable instru-

ments act went into effect is still available, whether such defense is one recognized by the law merchant or given by statute; that the negotiable instruments act by its express provision (Section 8163, General Code) recognizes and preserves such defenses; (4) that the doctrine of the Richard's case has been repudiated by eminent courts of last resort in other states.

The situation requires a somewhat extended analysis of the Richards case. In that case, the plaintiff bank brought suit on a note for $5,000, executed to its order by the Ohio Dredging Co. and C. E. Richards. The defendant Richards answered that he was surety only on the note, the Ohio Dredging Co. being principal, all of which was known to the plaintiff, and that plaintiff had, without the knowledge or consent of the answering defendant Richards, for a valuable consideration, extended the time of payment of the note. From this statement it will be seen at a glance that the note had not been negotiated, that the suit was between the original parties to the note, and that Richards occupied the position of an accommodation maker and claimed the rights and privileges of a surety. With reference to his note, Richards occupied the same relative position that defendant Fleming occupies to his note. The question presented for solution in the Richards case was whether an accommodation maker could claim the privileges of suretyship as they existed prior to the negotiable instruments act, and could avail himself of the defense that a valid contract had been entered into by the creditor and the principal debtor for extension of time of payment; a defense of equitable origin (*Ide* v. *Churchhill*, 14 O. S., 385) recognized in all courts prior to the adoption of the negotiable instruments act.

The questions presented for solution here are whether Fleming, as an accommodation maker, can claim the privileges of suretyship as they existed prior to the negotiable instruments act and thereby can avail himself of the statutory defense that plaintiff failed to sue upon the note after due notice to sue, as alleged in the first defense, and likewise whether he can avail himself of the defense of estoppel, as alleged in his third defense.

In the last analysis, the defense in the Richards case and the defenses here, are grounded upon the claim that, notwithstanding their apparent status as makers, Richards in his case and Flemhere are in fact mere sureties, and hence that they have the right to claim all the privileges attending that relationship.

The syllabus in the Richards case is as follows:

"1. One who signs a promissory note on the face thereof and who in that way becomes surety for the principal maker is by force of Section 3178, Revised Statutes, primarily liable for the payment of said note.

"2. Section 3175$j$, Rev. Stat., relating to the discharge of negotiable instruments, provides in what manner and for what causes such instruments may be discharged and by force of the rule *expressio unius est exclusio alterius*, sureties upon such notes who are primarily liable thereon can not be otherwise relieved from responsibility for their payment.

"3. The rule of common law that any agreement between the holder of a promissory note and the principal, which varies essentially the terms of the contract by which a surety is bound, without the consent of such surety, will work his release from liability is no longer in force as to one who has signed on the face of the instrument, such rule having been in effect abrogated by Section 3175$j$, Revised Statutes."

Judge Spear, who rendered the opinion in this case, says in part:

"That act (the negotiable instruments act) establishes the status of parties to negotiable instruments. As to accommodation parties, the provision (Section 3172$a$)· is:

" '(*Liability of Accommodation Party.*) An accommodation party is one who signs the instrument as maker, drawer, acceptor, or endorser, without receiving value therefor, and for the purpose of lending his name to some other person. Such a person is liable on the instrument to a holder for value, notwithstanding such holder, at the time of taking the instrument, knew him to be only an accommodation party.'

"As to those primarily liable. it provides that:

" 'The person primarily liable upon an instrument is the person who, by the terms of the instrument, is absolutely required to pay the same. All other parties are secondarily liable.' "

Judge Spear further says:

"By the negotiable instruments act, the discharge of negotiable instruments, as to persons primarily liable is provided in Section 3175*j*, and is as follows:

"Discharge of Negotiable Instruments.    Section 3175*j* (*Instrument; how discharged*).    A negotiable instrument is discharged:

"1.    By a payment in due course by or on behalf of the principal debtor;

"2.    By payment in due course by the party accommodated, where the instrument is made or accepted for accommodation;

"3.    By the intentional cancellation thereof by the holder;

"4.    By any other act which will discharge a simple contract for the payment of money;

"5.    When the principal debtor becomes the holder of the instrument, at or after maturity, in his own right."

The negotiable instruments act makes provision for discharge with respect to persons secondarily liable:

"Section 3175*k*.    (*When persons secondarily liable are discharged*.)    A person secondarily liable on the instrument is discharged:

"1.    By any act which discharges the instrument;

"2.    By the intentional cancellation of his signature by the holder;

"3.    By the discharge of a prior party;

"4.    By a valid tender of payment made by a prior party;

"5.    By a release of the principal debtor, unless the holder's right of recourse against the party secondarily liable is expressly reserved;

"6.    By any agreement binding upon the holder, to extend the time of payment or to postpone the holder's right to enforce the instrument, unless made with the assent of the person secondarily liable, or unless the right of recourse against such party is expressly reserved."

Judge Spear further says:

"The entire field of discharge appears to be here covered, and unless some controlling reason can be adduced showing that this statute does not apply, its application to and control of the case at bar would seem to follow.    It is, however, insisted by counsel for plaintiff in error that, since there is in the latter act no ex-

press repeal of earlier legislation bearing on the rights and liabilities of the parties on negotiable instruments, and since repeals by implication are not favored, we must conclude that the former legislation is still in force, and inasmuch as there is apparent conflict between the negotiable instruments act as construed by the courts below and the earlier legislation, it must be presumed that the construction thus given the act is not the correct construction and that the purpose ascribed by those courts to the General Assembly in passing the act was not its real purpose.

"The sections of the Revised Statutes to which special attention is called by counsel are Sections 5419, 5832, 5836, Revised Statutes. However, reference is likewise made to other sections of the same chapter.   *   *   *

"We fail to perceive any necessary conflict between these sections and the negotiable instruments act, in the particulars here involved.   *   *   *   The present section (3175*j*, Revised Statutes) as we have already found, provides only for the discharge of a party by a discharge of the instrument itself. Section 5833, Revised Statutes, provides that 'A person bound as surety in a written instrument for the payment of money may, if a cause of action accrue thereon, by written demand require the creditor to commence an action forthwith against the principal debtor and proceed diligently to collection, and failure to comply by the creditor shall work a forfeiture of his right to recover of the surety.'

"Here is a provision for discharge as to the instrument itself, and the question is, to whom, taken in connection with all the provisions of the negotiable instruments act bearing on the question of discharge, does it apply? Whether or not it might apply to those who are by Section 3178*a*, Revised Statutes, made secondarily liable, we need not stop to inquire, for we have not that situation. But it appears irreconcilable with Section 3175*j*, if attempted to be applied to parties whose names appear on the face of the instrument. We are of opinion that at all events, it should not be held applicable to those who by the terms of the negotiable instruments act are primarily liable, and the same conclusion applies to Section 3854, Revised Statutes. However, if these sections, or any of them, are so inconsistent with the negotiable instruments act as that they can not stand with it, then we are satisfied that the older enactments must give way.   *   *   *

"The evident intent of the General Assembly by the negotiable instruments act was to revise the general subject of the law

of negotiable instruments, and where specific provisions are made in the act in respect to a special subject-matter, such provisions must prevail. So where it is declared, as it is here declared, that a party to such an instrument who is absolutely required to pay the same is primarily liable and can be discharged from liability in certain specified ways and for certain specified causes, the reasonable conclusion is that the purpose was to enact that such party can not be discharged in any other way or for any other purpose."

"The act further provides that an accommodation party may be a maker without himself receiving value, that he engages that he will pay the instrument according to its tenor and may be held liable to the holder, though that party knew him to be only an accommodation maker, thus classifying him as one primarily liable, and in a subsequent section the act further purports to embody all the law as to release of parties "primarily liable" on negotiable instruments, by providing for the discharge of the instrument itself."

It will be seen from the foregoing that the court in the Richards case determined that, under the negotiable instruments act, the liability of an accommodation maker is primary and absolute; that the act having provided that one primarily liable can be discharged from liability only in certain specified ways and for certain specified causes, he can not be discharged from liability in any other way or for any other cause. The court, however, is careful to limit the case solely to discharge from liability incurred by a valid original obligation, and expressly says that the holding of the court does not imply that the ordinary defenses of fraud, duress, illegality of consideration, or other defenses that go to the original liability, are eliminated; and this view seems to harmonize the various provisions of the act.

The defense in the Richards case and the defenses here do not pertain to the original liability, but grow out of the subsequent conduct and acts of the parties, so that these defenses clearly fall within the category of "Discharge."

As to the first defense:

The negotiable instruments act having fixed the status of the accommodation maker, as between himself and the holder, he

can not assume any other position or status. As to the holder, he can not say that, "My position on the note is only apparent; my real position is otherwise." As to the liability of parties to a negotiable instrument, the negotiable instruments act recognizes only two classes; those primarily liable and those secondarily liable. The word "surety" is nowhere found in the act. To permit the accommodation maker to assume the position of a surety only is to place him in the category of those liable secondarily, which is directly antagonistic to the express provisions of the statute. It is true that the statutes in existence prior to the adoption of the negotiable instruments act permitted the real relation to be shown and gave to the surety the right to serve the creditor with notice to sue and upon his failure so to do the security was discharged from all obligation on the note. Those statutes have not been repealed. Are they still in force so far as accommodation makers of negotiable instruments are concerned?

The views expressed by Judge Spear above upon this point while perhaps *obiter*, yet they are very persuasive and agree with my own opinion in the matter. Under the negotiable instruments act, Fleming's apparent engagement as the maker and the principal debtor is his real and actual engagement. He signed the note as maker. By the terms of the instrument, he is absolutely required to pay it. The statute in such case makes him an actual principal and renders him primarily liable. though in fact he received, with the knowledge of the bank, no part of the consideration and signed the note only for the purpose of lending his name to the Howell Provision Co. Having signed the note as an apparent maker and as an apparent principal debtor, he is not now permitted to assert the contrary so as to affect his liability on the instrument, and, as said by Judge Spear, "This position being antagonistic to the right conferred by Section 5833, Revised Statutes (12192, General Code), that section must give way." If I am right in these conclusions, then the first defense is amenable to a demurrer, and I so find.

Coming now to the third defense:

I feel like saying, as the Italians say, "*Pertroppo dibatter la verita si perde.*"

The contest in this case has waged earnestly around the issues made by this defense. One allegation requires preliminary consideration, to-wit, "that plaintiff for a valuable consideration, in writing released and discharged the defendant from all liability upon the note described in the petition  *  *  *  ."
In my judgment, this allegation saves this third defense, and because of its presence in said defense, demurrer will not lie. No evidence, however, was offered of any release in writing or of any consideration for a release. Under the negotiable instruments act, this allegation of release in writing for a valuable consideration, in and of itself, would constitute a valid defense to the note.

Section 8227, General Code, provides:

"The holder may expressly renounce his rights against any party to the instrument before, at, or after its maturity * * * and renunciation must be in writing, unless the instrument is delivered up to the person primarily liable thereon."

As to the other allegations of this defense, what has already been said in passing on the first defense as to the provisions of the negotiable instruments act is pertinent here. Leaving out of view the allegation of a release in writing, the whole theory of this third defense is based upon the assumption that the defendant Fleming was a surety only and secondarily liable, a position that, under the negotiable instruments act, as we have seen, he is not permitted to assume. Under this act, as accommodation maker his liability is primary and absolute. The defense of estoppel can not avail him, unless he can assume the position of surety. No suretyship, no estoppel. Cut away this element and the whole defense falls to the ground. The material allegations of the defense are that Fleming applied to the plaintiff's cashier to know why suit had not been brought against the defendant, the Howell Provision Co., on the note, in accordance with his previous written request therefor; that the cashier then said to him that he was released from all obligation on the note; that he was thereby, by reason of such representation, lulled into security and lost rights against the defendant, the provision company, and against his co-surety, Howell.

It is not contended by counsel for defendant that Robbins, the cashier, actually released Fleming, or that Fleming was ever released by any formal act of the bank, or that the bank gave Robbins any express authority to release Fleming. Section 8227, General Code, provides that a renunciation must be in writing, unless the instrument is delivered up to the person primarily liable thereon. This section of the negotiable instruments act has been considered in two cases: *Baldwin* v. *Daly*, 83 Pac., 724; *Pitt* v. *Little*, 108 Pac., 942. In those cases, it is said:

"An absolute and unconditional renunciation of his rights against the principal debtor made at or after the maturity of the instrument discharges the instrument, but a renunciation does not affect the rights of a holder in due course without notice. A renunciation must be in writing, unless the instrument is delivered up to the person primarily liable thereon. This plainly provides that renunciation of a debt must be in writing where the debt is evidenced by a negotiable instrument and if 'renunciation' is used therein in the sense of release, there can be no question that the appellant must show a written renunciation in order to prove the allegations of his answer. Counsel for the appellant argue that the word is used in a sense different from that of release and that while a renunciation must be in writing a release may be proved by parol, but we can not think that the statute permits of this distinction. The words, 'The holder may expressly renounce his rights against any party to the instrument,' must refer to the release and discharge of a party to the instrument from his obligation to pay it, else they can have no legitimate meaning."

Defendant's counsel, however, assert that Robbins, the cashier, said to Fleming, "You are released," and that such representation lays the foundation for an estoppel *in pais* against the bank to assert the contrary, when such representation has been acted upon by Fleming to his prejudice. Whether such representation will lay the foundation for an estoppel against the plaintiff bank will depend upon whether the cashier, Robbins, was expressly or impliedly authorized to make such representation. It is not claimed, and the evidence does not show, that Robbins had express authority to make such representation. It is claimed, however, by defendant's counsel, that the right to

make such representation by the cashier, falls within the ordinary and usual powers bestowed upon such officers, according to the customs and usages of the business in which such agents are employed.  It is clear that the bank is not bound by the representation, unless such act falls within the apparent or ostensible authority of the agent.  A bank cashier has no authority to bind the bank by declarations or admissions outside of the general line of his duty.

In the case of *Savings Bank* v. *Hughes*, 62 Mo. App. Rep., the second paragraph of the syllabus is:

"A cashier, without special authority, has no power to discharge a surety on a note without payment, and an instruction implying such power is condemned."

In this case, page 581, the ordinary and usual powers of cashiers are set forth:

"The cashier of a bank is held out to the public as having authority to act according to the general usage, practice, and course of business of such institutions.  He is usually entrusted with all the funds of the bank, in cash, notes, bills, and other choses in action, to be used from time to time for the ordinary and extraordinary exigencies of the bank; he receives directly and through subordinate officers all moneys and notes; he delivers up all discounted notes and other securities when payments have been made; he draws checks from time to time for moneys whenever the bank has deposits.  In short, he is considered the executive officer of the bank, through whom the whole monied operations of the bank in paying or receiving debts or disposing or transferring securities are conducted."

In *Bowles on the Modern Law of Banking*, page 362, it is said:

"In this regard, the law is as imperative as ever and consequently the cashier can not, without receiving an equivalent, release the maker, endorser, or guarantor of any obligation or release or give up any kind of property whereby the bank's interests would be sacrificed."

In *Bank* v. *Jones*, 8 Pt., 12:

"The officers of the bank have no authority as agents of the

bank to bind it by assurances which would release the parties to a note from their obligations.''

In *Bank* v. *Wetzel*, 58 W. Va., 1, 70 L. R. A., 308, it is said:

''A cashier has no implied power merely by virtue of his office to receive money for interest in advance on a note owned by the bank and agree to extend the time of payment and thus discharge the endorser from liability.''

In *Clark & Marshall on Corporations*, Section 2158, it is said:

''The cashier of a bank, unless specially empowered to do so, has no authority to release otherwise than in the due course of business on a payment.''

In *Davis County Savings Assn.* v. *Saylor et al*, 63 Mo., 27, the first paragraph of the syllabus is:

''The general duties of the cashier of a bank are to collect notes, keep the funds arising from them, and deliver up notes and other securities when paid, and in the absence of special authority, he has no power to discharge the surety on a note, and his representations to the surety that he is no longer looked to will not bind the bank, nor will the bank *be estopped* from asserting its claim by reason of such assurance.''

Two cases cited by counsel for defendant clearly point out the limitations on the power of cashiers in regard to declarations made by them. In the case of *Bank* v. *Haskell*, 51 N. H., 116, 12 Am. Rep., 67, the cashier told the surety, who had applied to him for information about a note, that the note had been paid or secured, and that he (the surety) need give himself no further trouble about it. The court say:

''A cashier has no authority to bind the bank by a discharge of its debtors without payment or to release a surety by an agreement that he should not be called upon to pay a note that he was liable on in ordinary cases, but if, knowing one to be a surety upon a note, he informs him that such note *is paid*, intending him to believe it, and the surety, relying upon that statement, changes his position towards his principal by endorsing a new note or by giving up securities, the bank will be estopped from denying that the note is paid.''

In the case of *Manufacturers' Bank* v. *Schofield,* 38 Vt., 590, the surety applied to the cashier of the bank and inquired whether the note *had been paid.* To this inquiry the cashier responded that another party to the note (Flood) had told him that the note was for him (Flood) to pay and had directed him (the cashier) to charge it to Flood in his account with the bank, that he had done so, and that they need not give themselves any further uneasiness or trouble about the note, as it was all right. The court say:

"This is not an agreement between the cashier and the Schofields that they were to be discharged from their liability without payment and the bank to look to Flood for pay. Such an agreement the cashier could not have made that would have been binding upon the bank, and the Schofields would have been bound to know it. The information he gave was false. The defendant relied and acted upon it to his prejudice and now insists that the bank is estopped from enforcing the note."

The court held that the bank was bound by the representations of the cashier and was thereby estopped from asserting any claim against the surety.

It will be observed that in both these cases the inquiry was as to whether the respective notes *had been paid,* and in both the Haskel and Schofield cases the declaration of the cashiers was within their authority, because it related to the matter of payment of notes involved, a matter under their peculiar control, and, of course, within the knowledge of the cashiers. But in the case at bar, the declaration of the cashier was not that the note had been paid, but, "You are released," and in further conversation, it is claimed that the cashier said, "If I had known the condition of the Howell Provision Co., I would not have released you." It is apparent from the authorities already considered, that the cashier would have no power to release Fleming, and that Fleming would be bound to know that fact. The statement of a cashier that one is *released* from the obligation of a note is a very different thing from the statement that the note *has been paid.* While the usual powers bestowed on cashiers are broad enough to authorize the latter statement, be-

cause the matter of payment is peculiarly within their knowledge, not so with reference to the statement about a release.

Under the authorities it would seem to be perfectly clear that the representation by the cashier to Fleming, that he had been released, was wholly outside of the sphere of his authority as cashier, and that Fleming was to know it and therefore he had no right to rely on it. The fair implication from the statements claimed to have been made by the cashier to Fleming is that the cashier had released Fleming, or at any rate, that the cashier's statements amounted to a representation about some act of his own as cashier, regarding the matter of release. Under the authorities, he had no power to make such statement or declaration about the matter. Defendant's counsel claim, however, that the statement of the cashier does not necessarily refer to an individual act of his own, but may have reference to an act of someone else higher up in authority than the cashier, and that Fleming may have so understood it; that by virtue of his position as cashier he would have knowledge of such act and that it would fall within his apparent power as cashier to impart information about it; that his representation, if relating to the supposed act of another, as the president or board of directors, would be as effective as if relating to a supposed act of his own. This position is no more tenable under the authorities than the other, for the reason that neither the president nor the board of directors itself has power to discharge a surety without a consideration for the discharge.

In the case of *Hodges Excrs.* v. *Bank of Richmond*, 22 Gratt., pp. 49-52, it is held that:

"The directors of a bank can not release without a consideration a debt due to the bank. *A fortiori* they can not empower a cashier so to do and a *multo fortiori* the president can not do so by virtue of his office. Neither the president nor the cashier, by virtue of his office, can give up an obligation or a liability to the bank or bind the bank by such admission."

In *Bank of the United States* v. *Dunn*, 6 Pt., 51, it is held:

"Agreements by a president and a cashier that an endorser shall not be liable to the bank is invalid. They can not make

such agreement nor have they power to bind the bank except in the discharge of their ordinary duties.''

So that, assuming that Robbins, the cashier, made the statements about the release, if Fleming understood thereby that the statements had reference to his own individual act as cashier, they would not lay foundation for an estoppel because (1) an oral release would not be effectual, (2) the cashier had no authority, express or implied, to make such statement. If Fleming understood that the statements of the cashier related to some action of the president or board of directors, they can not avail him, for the reasons already given and for the further reason that the act of the board of directors in making a release without a consideration would be *ultra vires* and equally futile as the act of the cashier in that regard. The statement of the cashier, even if it related to such supposed act on the part of the president or the board, would not have a particle more effect than if it related to his own supposed act.

The principles laid down in the Richards case and the construction therein given to the negotiable instruments act have received the sanction of other eminent courts of last resort. See cases of *Vanderford, Ex., v. Bank,* 105 Md., 164; *Rouse v. Wotten,* 140 N. C., 557; *Wolstenholme v. Smith,* 97 Pac., 329 (Utah); *Bradley Engineering Co. v. Heyburn,* 106 Pac., 150; *Cellers v. Meacham,* 49 Ore., 49; *Bank v. Toplitz,* 81 App. Div., 593 (affirmed 74 N. E., 1); *Fritz v. Kirkdoffer,* 124 S. W., 882; *Cowen v. Ramsey,* 140 Pac., 50.

Opposed to these authorities are the cases of *Lumber Co. v. Snouffer,* 117 N. W., 50 (Ia.); *Long v. Shafer,* 171 S. W., 690 (Mo. Ct. App.).

In these two cases, the doctrine is maintained that the proper construction of the negotiable instruments act, so far as it relates to the discharge of instruments and to the release of parties, is to fix the rights of holders in due course and that it does not apply to any other class of holders. In the case of *Long v. Shafer, supra,* which followed the Snouffer case, there is a dissenting opinion by Judge Sturges, in which he states that the opinion of the majority of the court is opposed to the current of authority.

Other decisions are cited by defendant's counsel which bear upon the question.

In the negotiable instruments act, we find the terms "holder," "holder for value," "holder in due course." To limit the provision relating to a discharge to holders in due course only, it seems to me, is to do violence to language. The section says that a negotiable instrument (not a negotiated instrument) is discharged, etc. * * * by intentional cancellation by the holder (not holder in due course).

As to the contention made by the defendant that the attention of the Supreme Court in the Richards case was not directed to this phase of the subject and that, if it had been, the decision might have been otherwise, it is only fair to say that the eminent judges of that court could hardly have overlooked so vital a matter. The briefs of counsel in that case and Judge Spear's opinion in the case show that the case took a very wide range. To reach a conclusion, existing statutes relating to sureties and practically the whole of the negotiable instruments act had to be considered. Since the decision of the Richards case, other eminent courts of last resort have refused to follow the doctrine of the Iowa case and have approved the doctrine of the Richards case and adopted it as the law of their jurisdictions.

This is a case of great hardship and grows out of the transition from the old to the new law. The negotiable instruments act was passed in 1902. The note sued upon here was made in 1905. The Richards case was not decided until 1908. There is this to be said, however: that the negotiable instruments act does not affect rights of makers *inter partes.* Fleming, as surety, had certain rights that he could have enforced as against his principal. Section 12206, General Code, gives him the remedy to compel the principal to pay or secure the debt.

The finding will be in favor of the plaintiff for the full amount claimed, less the credits, with interest to the first day of this term. I find the amount to be $10,242.24. Exception noted. Motion for a new trial may be filed, which motion will be overruled, and exception noted.